IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>TERRY ROBBINS,<br><br>　　　　Defendant. | Case No. CR11-0014<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

*I. INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*II. PROCEDURAL HISTORY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III. ISSUE PRESENTED*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*IV. RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
　　*A. 911 Hang-Up Call*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
　　*B. Officers Respond*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
　　*C. Description of the Property*. . . . . . . . . . . . . . . . . . . . . . . . . . 4
　　*D. Officers Approach the House*. . . . . . . . . . . . . . . . . . . . . . . . 4
　　*E. The Search*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*V. DISCUSSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
　　*A. Is the Fourth Amendment Implicated?*. . . . . . . . . . . . . . . . . 7
　　*B. Does the Emergency Aid Exception Apply?*. . . . . . . . . . . . . 9

*VI. RECOMMENDATION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## I. INTRODUCTION

On the 29th day of March 2011, this matter came on for hearing on the Motion to Suppress (docket number 25) filed by the Defendant on February 24, 2011. The Government was represented by Assistant United States Attorney Daniel C. Tvedt.

Defendant Terry Robbins appeared in person and was represented by his attorney, Mark C. Meyer.

## II. PROCEDURAL HISTORY

On January 11, 2011, Defendant Terry Robbins was charged by Indictment with one count of manufacturing, and attempting to manufacture, 100 or more marijuana plants.[1] Defendant entered a plea of not guilty and trial was scheduled for March 28, 2011.

On February 24, 2011, Defendant timely filed the instant motion to suppress. The motion was set for hearing on March 4, and the trial was continued to May 2. At Defendant's request, however, hearing on the motion to suppress was subsequently rescheduled on March 29, 2011.

## III. ISSUE PRESENTED

Defendant contends that a warrantless entry onto his property on October 23, 2010 was violative of the Fourth Amendment and, therefore, the fruits of a subsequent search executed pursuant to a search warrant must be suppressed. The Government argues that the officers were legitimately on the property, which resulted in probable cause being established for the subsequent search warrant.

## IV. RELEVANT FACTS

### A. 911 Hang-Up Call

At approximately 9:54 p.m. on October 23, 2010, Cedar Rapids police "dispatch" received a "911 hang-up call." That is, a call came in on the 911 line, but when the operator answered, there was no one there. When the 911 operator attempted to call the number back, it was busy.

The records reflect that the call was initiated from phone number (319)363-1179. The "subscriber" of the phone is shown as "Carl A Nelson." The "automatic location information" received by the initial 911 operator reflects that the subscriber is a business

---

[1] On February 8, 2011, the Indictment was superseded to correct the statutory penalty reference. See docket number 19.

with an address of 960 60th Avenue SW in Cedar Rapids.[2] However, the information displayed on the "computer aided dispatch" system, and the information which was transmitted to the responding officers' in-car computer, simply identified the caller as Carl A Nelson. That is, the officers were not told that the subscriber of the phone line is associated with a business.

## B. Officers Respond

Officers Jeff Holst and Casey Hoeger – operating in separate cars – responded to the scene. According to the "calls for service report," the officers were dispatched at 9:55 p.m. and arrived at the scene at 10:01 p.m.[3] Officer Hoeger arrived first. According to Hoeger, he approached the scene traveling west on 60th Avenue. This is an industrial area, as illustrated in Government's Exhibit 1. Hoeger noticed a residence in the 800 block of 60th Avenue, but the GPS map on his in-car computer showed the target address as originating "midway" between the railroad tracks and 11th Street. Hoeger did not find a residence prior to arriving at 11th Street, so he turned around and headed back on 60th Avenue toward the railroad tracks. While heading eastbound, Hoeger pulled into a driveway on the south side of 60th Avenue. That's when he "noticed lights on in a residence behind two industrial buildings."[4] Hoeger pulled up the driveway "a little bit further" and stopped.

Officer Hoeger then observed Officer Holst drive by on 60th Avenue, proceeding west. Like Hoeger, Holst did not see the residence when first driving by. Holst made a u-turn at 11th Street and came back, spotting the reflector tape on Hoeger's squad car. Hoeger flashed his flashlight at Holst to reveal his location. Holst then turned in to the driveway and joined Hoeger. Hoeger told Holst that "I can't find any other house in this area" and suggested that they "check this place."

---

[2] *See* Defendant's Exhibit A at 1.

[3] *See* Government's Exhibit 7.

[4] The view from the street is approximated by Government's Exhibit 3.

The officers then walked up the driveway and approached the residence.[5] According to Officer Holst, there were interior lights on in the house on the first and second floors. The exterior porch light was also on. However, the light on the garage (as shown on Government's Exhibit 5) was not on. No persons could be seen, there were no unusual sounds, and there was no indication of a disturbance.

### C. Description of the Property

Because of the nature of Defendant's claims, a detailed description of the house and property is necessary.[6] The house and garage share a common roof line, but there is an open area between the garage and the house, which the Court will refer to as a "breezeway." The breezeway is nearly as wide as the garage and appears to be designed to allow a vehicle to be pulled in, if desired. The front of the breezeway is enclosed by a double wooden gate which appears to be approximately five feet tall.[7] The back of the breezeway is open to the backyard.

The double gate opens in the middle and extends nearly the entire width of the breezeway. On the back side of the double gate, one side has a stake which can be inserted into the cement – preventing the gate from opening – and there is a latch near the top which keeps the other half of the double gate from opening. Immediately upon entering the breezeway, there are two steps up to the porch on the right, where the front door is located. The front yard and back yard are entirely enclosed by a chain link fence. That is, access to the front door can only be obtained through the breezeway.

### D. Officers Approach the House

Officer Holst testified that as the officers approached the residence, the double-gate to the breezeway was "wide open; it wasn't just unlatched." According to Holst, "it's as if the gate wasn't there, because I mean it's a very large gate. It's not like you're walking

---

[5] The view from partway up the driveway is illustrated by Government's Exhibit 4.

[6] Government's Exhibits 3-5 and Defendant's Exhibit E are a number of photographs depicting the exterior of the house and property.

[7] A close-up of the area is shown on Government's Exhibit 5.

through a small narrow gate. The whole thing was open." Officer Hoeger testified that he could not remember if the gate was open, but indicated that he did not open it. When asked whether Holst opened the gate, Hoeger responded "he could have. I can't say whether he did or not."

After entering the breezeway, the officers went to the front door and knocked, but did not receive any response. They then conducted a "quick perimeter check," by walking around the residence. They were not able to effectively see in the windows, but did not see or hear anything amiss. Holst opined, however, that "there was so many lights on the house, it appeared to us there was somebody home."

The officers then returned to the front door and knocked again, with no response. While at the door, Officer Holst smelled an odor of dry – as opposed to burnt – marijuana. Officer Hoeger testified that he was "stuffed up" with a cold and did not initially smell the marijuana. When it was brought to his attention by Holst, however, Hoeger "stuck [his] face up to the crevice of the door" and could smell a "minor whiff" of marijuana.

After Officer Hoeger called their command sergeant, it was determined that a K-9 officer would be called to the scene with a drug dog. Upon arriving, the dog immediately "indicated" on the front door of the residence. It was then decided that Officer Fear – the K-9 officer – would seek a search warrant for the residence, while Officers Holst and Hoeger remained on the scene.

### E. *The Search*

During the course of preparing the search warrant application, Officer Fear called Officer Holst for a detailed description of the residence. According to Holst, Fear "wanted to know what color the numbers were indicated on the house." It was at that time that Holst initially discovered that the address at the residence was 925 60th Avenue, not 960 60th Avenue. Government's Exhibit 5 reflects the numerals 925 prominently displayed on the exterior wall between the garage door and the breezeway gates. Holst testified that the numbers were black and not easily seen at night. As noted above, the outside light located immediately above the address was not on. According to Holst,

5

officers minimize the use of flashlights at night, for security reasons. It should also be noted that if the gates were open, then the address may be obstructed. In preparing the search warrant, it was also determined from the county assessor's records that the property is owned by Defendant Terry Robbins. Officers apparently did a driver's license and criminal records search for "Carl A Nelson," but found nothing.

A state search warrant was issued and the property was searched during the early morning hours of October 24. A sophisticated marijuana growing operation was found in the basement. Officers found 297 marijuana plants, including 93 which were about six feet tall. The search revealed various items used to grow marijuana plants, including approximately 60 bags of fertilizer. Officer Brian Freeberg of the Cedar Rapids Police Department testified that the basement had two venting systems, which vented odors out second floor windows.

On the following day, October 25, Sergeant Dostal attempted to call the phone number that was listed on the 911 hang-up call and "it just kept ringing, it never went to voicemail, or no one ever picked up." Upon further checking, Dostal identified a Carl A Nelson Construction Company in Burlington, Iowa. It was determined that the company had obtained the phone line for a construction trailer on the ADM site in Cedar Rapids. Its work was complete and it apparently tried to cancel the line a couple of months earlier, but was unsuccessful. The company reported that the address of the construction trailer was 1030 60th Avenue SW. Defendant's Exhibit D illustrates that a Google search of "960 60th Avenues SW, Cedar Rapids, IA" reflects, among other things, a reference to Carl A Nelson and general contractors.[8] Upon investigation, it was determined that there is no 960 60th Avenue or 1030 60th Avenue.[9]

---

[8] The record is imprecise regarding the date of the Google search, but it was apparently no sooner than March 3, 2011.

[9] Government's Exhibit 2 shows the street addresses in the vicinity of Defendant's property.

## V. DISCUSSION

Initially, it should be noted that Defendant does not challenge the validity of the search warrant. That is, Defendant apparently concedes that the search warrant was supported by probable cause and was not otherwise defective.[10] Rather, Defendant argues that the officers violated his Fourth Amendment rights in obtaining the information which provided probable cause for the search warrant. Specifically, the Court must determine whether the officers violated the Fourth Amendment in approaching the property's front door, where they smelled the odor of fresh marijuana.

In his brief, Defendant recognizes that "[u]nder the 'emergency aid exception' to the warrant requirement, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Defendant argues, however, that the emergency aid exception is inapplicable here because the 911 hang-up call did not originate from Defendant's property and there was no other objective indication that an emergency existed at the house. The Government responds that the officers' actions were objectively reasonable under the circumstances.

### A. *Is the Fourth Amendment Implicated?*

Defendant asserts that by passing through the gates to the breezeway, the officers invaded the curtilage of the property, without a constitutional justification. The Government argues that walking through an open gate to approach the front door does not violate the Fourth Amendment. The Court must first determine whether the Fourth Amendment is implicated by the officers approaching Defendant's front door.

As a factual matter, the Court finds that the double gates on the breezeway were open when the officers approached the area. Officer Holst testified unequivocally and repeatedly that the gates were "wide open" and it was "as if the gate wasn't there."

---

[10] The search warrant application was not submitted as evidence at the instant hearing, but one assumes that it established probable cause by the officers' observations and the "indication" by the drug dog.

7

Officer Hoeger could not recall if the gates were open and, in response to cross-examination, conceded that Hoeger "could have" opened the gate. In order to open the double gates, however, it would have been necessary for Holst to reach over the gate, unhook the latch, open one side of the double gate, lift the stake keeping the other side from opening, and then open the second half of the double gate. *If* Holst had opened the gate in this manner, it is likely that Hoeger would have remembered it. Accordingly, to conclude that the gate was closed when the officers arrived, the Court must also conclude that Holst perjured himself at the instant hearing, and that Hoeger could not remember a sequence of events which would have been apparent and presumably memorable. The Court has no reason to believe that either officer testified falsely. I find Holst to be credible when he testified that the gates were open.

As described above, the porch steps are immediately to the right upon entering the breezeway. The officers climbed two steps to the porch and proceeded directly to the front door. The Eighth Circuit Court of Appeals has recently confirmed that passing through an open gate and proceeding to the front door does not constitute a "search" and does not implicate the Fourth Amendment. *Nikolas v. City of Omaha*, 605 F.3d 539, 546 (8th Cir. 2010) (an officer did not need a warrant to "enter the property through its open gate and proceed up the driveway to the front door of the main residence to ask for consent to search *inside* any part of the residence").

The standard for determining when a search violates Fourth Amendment guarantees turns on "whether the defendant has a legitimate expectation of privacy in that area." *United States v. Ventling*, 678 F.2d 63 (8th Cir. 1982). "The absence of a closed or blocked gate in this country creates an invitation to the public that a person can lawfully enter along the driveway during daylight hours to contact the occupants for a lawful request and if the request is refused to leave by the same way." *Id.* at 66 (cited with approval in *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006)). Notwithstanding the presence of "no trespassing" signs, the Court in *Ventling* found that "the driveway is not 'protected curtilage' under these circumstances." *Id.* Similarly, the

Court in *Lakoskey* concluded that "we will not extend Lakoskey's expectation of privacy to his driveway, walkway or front door area." *Lakoskey*, 462 F.3d at 973.

"A Fourth Amendment search occurs when the government invades an area in which a person entertains a legitimate or justifiable expectation of privacy." *United States v. Reed*, 733 F.2d 492 (8th Cir. 1984) (citing *Rakas v. Illinois*, 439 U.S. 128 (1978)). In *Reed*, an officer proceeded through an open gate into the rear parking lot of a construction company. In considering motions to suppress, the Court addressed the "threshold matter" of whether the officer's "initial warrantless entry onto [the company's] back parking lot constituted a Fourth Amendment 'search', triggering the probable cause and exigent circumstances requirements." *Id.* at 500. In concluding that the officer's actions did not invade the defendants' reasonable expectation of privacy, the Court noted that "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors – such as driveways, walkways, or similar passageways." *Id.* at 501.

Applying these principles to the instant action, the Court concludes that officers Holst and Hoeger did not conduct a "search" when they proceeded up the driveway, through the open gates of the breezeway, onto the porch, and knocked on Defendant's front door. It was, in fact, the only way that anyone could approach Defendant's front door. With the gates to his breezeway open, the Court believes that Defendant had no reasonable expectation of privacy in the area adjacent to his front door. Accordingly, the officers were lawfully in the area where they first identified the smell of marijuana, thereby leading to the establishment of probable cause for a search warrant.

### B. Does the Emergency Aid Exception Apply?

Having concluded that the Fourth Amendment is not implicated by the officers being in an area where Defendant had no reasonable expectation of privacy, it is not necessary that the Court determine whether an exception to the warrant requirement applies. Nonetheless, in the event the district court disagrees with my conclusion above, I will also address the "emergency aid exception" to the warrant requirement.

In *Brigham City v. Stuart*, 547 U.S. 398 (2006), and *Michigan v. Fisher*, ___ U.S. ___, 130 S. Ct. 546 (2009), the Court addressed an "emergency aid exception" to the requirement that a warrant issue for a search inside a home (or other protected area). The Court recognized the "basic principle" that searches "inside a home without a warrant are presumptively unreasonable." *Brigham City*, 547 U.S. at 403 (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* Specifically, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* This "emergency aid exception" requires "an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Fisher*, 130 S. Ct. at 548 (quoting *Mincey v. Arizona*, 537 U.S. 385, 392 (1978)).

Defendant claims that the emergency aid exception is inapplicable here, because the 911 hang-up call did not originate from Defendant's property, and the officers found no indication of a disturbance upon their arrival. The officers were told that the 911 hang-up call originated from "Carl A Nelson" at 960 60th Avenue SW. Both officers testified that they assumed the call originated from a residence, because based on their experience a business would generally be identified in its name.[11] The GPS system on the officers' in-car computers indicated that the address associated with the hang-up call was located between the railroad tracks and 11th Street. Defendant's house was the only residence matching that information. Accordingly, the Court believes that it was objectively reasonable for the officers to believe that the call originated from the house to which they were responding.

As noted at the time of hearing, a 911 hang-up call can represent any number of circumstances, ranging from a child's prank to a life-threatening situation. In this case,

---

[11] As noted above, the "automatic location information" identified the subscriber of the phone number as a business, but that information is not displayed on the "computer aided dispatch" system, and the information was not transmitted to the responding officers.

the 911 operator attempted to return the call, but received a busy signal. Officer Holst, who is a former paramedic, testified that "my biggest fear is somebody laying in there, called 911 and passed out or some other sort of thing like that and has a medical problem."

Defendant emphasizes that the scene found by Officers Holst and Hoeger was substantially different from the chaos encountered by the officers in *Brigham City* and *Fisher*. The emergency aid exception is not limited, however, to those cases where the officers observe an altercation or other evidence of violent behavior. Instead, it extends to those circumstances where entry into a protected area is necessary "to render emergency assistance to an injured occupant," *Brigham City*, 547 U.S. at 404, or if there is a reasonable basis for believing that "a person within the house is in need of immediate aid." *Fisher*, 130 S. Ct. at 548. Here, it was believed that a 911 call had originated from the residence, the line was busy when the 911 operator attempted to return the call, and, while there were lights on throughout the house suggesting someone was home, there was no evidence of movement within the house. Under these circumstances, the Court believes it was "reasonable" – the touchstone of the Fourth Amendment – for the officers to approach the front door to determine if a person inside the house was in need of aid. Accordingly, the emergency aid exception provides the necessary exception to the general warrant requirement.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully **RECOMMEND** that the district court **DENY** the Motion to Suppress (docket number 25) filed by the Defendant.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."* Accordingly, if the parties are going to object to this Report

and Recommendation, they must promptly order a transcript of the hearing held on *March 29, 2011.*

DATED this 5th day of April, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA